UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

00 MAR 21 PM 1:03

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| LINDA LEE; VICKY RAY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Civil Action No. CV-98-S-2232-NE |
| | ) |
| STATE OF ALABAMA DEPARTMENT OF | ) |
| MENTAL HEALTH AND MENTAL | ) |
| RETARDATION; VIRGINIA A. ROGERS, | ) |
| as Commissioner of the Alabama | ) |
| Department of Mental Health and | ) |
| Mental Retardation; and BETTIE | ) |
| PITTS PERKINS, Individually and | ) |
| as Unit Director and Employee, | ) |
| Agent, and Servant of the | ) |
| Alabama Department of Mental | ) |
| Health and Mental Retardation, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiffs commenced this present action alleging that defendants unlawfully discriminated against them on the basis of their race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. Plaintiffs are Caucasian, and allege they were denied five promotions given to African-American employees.

This action is before the court on defendants' motion for summary judgment. For the reasons set forth below, the court finds the motion is due to be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.)  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(per curiam).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.  When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d

2

at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the

3

nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiffs.

## II.  FACTUAL BACKGROUND

Plaintiffs were employed as mental health workers, grade II, at the Lurleen B. Wallace Development Center ("Wallace Center"), an entity which is supervised by the Alabama Department of Mental Health and Mental Retardation.[1]  Plaintiff Linda Lee originally was hired in October of 1971 as a mental health worker, grade I, but was promoted to the higher position in 1976.[2]  Plaintiff Vicky Ray was hired in September of 1972 as a mental health worker, grade I,

---

[1] The job title affixed to this position has changed throughout plaintiffs' employment.  Originally, plaintiffs were described as psychiatric aids.  Later, the label was altered to that of mental health workers.  Presently, the position is described as training specialists.  *See* Ray's deposition at 11-12.  For the sake of this memorandum opinion, however, the court refers to the positions as mental health workers.

[2] Lee's deposition at 10.

4

and4 was promoted in 1980.[3]

Between 1997 and 1998, there were five vacancies at the Wallace Center for the position of mental health worker, grade III. The vacancies did not occur simultaneously, but occurred between the dates of January 4, 1997, and January 3, 1998. Both plaintiffs applied for the vacancies, and were included on a "banded list" composed by the Alabama Personnel Department.[4] A "banded list" consists of the names of ten persons who, in the opinion of the Alabama Personnel Board, are the most qualified applicants eligible for promotion to a vacant position.[5]

After the Wallace Center received the banded list, they initiated an interview process for all of the eligible applicants.[6] According to Steven B. Spier, the Personnel Director of the Wallace Center,[7] that process consisted of the following:

Greg Ethridge [8] and I will sit down and decide who we feel like should be included on the interview panel, and then we would make recommendations for that. At the same time, if there aren't questions already developed for the position, we would begin the development of those questions involving whoever would be involved in the interview process and where the position is located. The questions are developed. Then

---

[3] Ray's deposition at 11.

[4] Spier's deposition at 125-26, 128; see also plaintiffs' exhibit 17.

[5] Spier's deposition at 111-13, 125-28.

[6] *Id.* at 39-40.

[7] *Id.* at 23.

[8] Greg Ethridge is the Assistant Personnel Director at the Wallace Center. *See* Ethridge's deposition at 9.

5

the candidates on the register are notified.  The Panel is
assembled....  Then candidates on the register are notified
of the time and place for the interview.

The interview process takes place with the panel members.
The first process that takes place during that interview is
the question and answer session or portion of the process.
Each panel member has a copy of the questions that will be
asked during the interview process and those are the only
questions that are asked unless there are follow-up
questions about some answer or issue raised by the
applicant.  Basic questions are there.  They remain the
same.  They go through a rotation of asking each applicant
the same question.

At the conclusion of that individual's interview, they are
ranked by each individual member separately, based on a
score that they are given.  It is set up on a form for
response to KSA's — knowledge, skills and abilities.  When
all the applicants have been interviewed, the scoring sheets
will be submitted to or turned over either to the personnel
office by the head panel member or, if Mr. Ethridge or I sit
on the panel, they will be turned over to us.

At that point, they are taken — they need to be taken by
either Mr. Ethridge or I and scored and ranked.  Then that
part of the process is complete.  Then the members,
certainly to include the department head, would get together
and look at other aspects of the employee's work history. [9]

Following that, the panel is then ready to make their
recommendation for appointment. The recommendation is made.
If it is accepted, then the individual selected is notified
and they are given an effective date of the appointment and
other particulars that go with it. [10]

The panel that interviewed the applicants for the mental health

---

[9] These "other aspects" include the employee's work history and performance
evaluations, and whether any disciplinary action was taken against the employee.
*See* Spier's deposition at 58.

[10] *Id.* at 39-42.

6

worker III positions consisted of Charles Cutts, Greg Ethridge, and defendant Bettie Perkins.[11] Perkins and Cutts are of African-American heritage, while Ethridge is Caucasian.[12] Defendant Perkins, one of two Unit Directors at the Wallace Center, was appointed to the panel because the individuals selected for the vacancies would report directly to her.[13]

During the interviews, the applicants were asked a series of questions that were previously prepared by Ethridge and Spier.[14] Each panel member then ranked the applicants based on their responses.[15] There were no established guidelines to guide the panel members in their scoring decisions, however, so each member's score was discretionary and individually based on subjective criteria.[16] Perkins and Cutts gave their interview scores to Ethridge, and Ethridge composed the following comprehensive ranking of applicants.[17] (The final rankings did not include any mention of the applicant's race, but the court has included that

---

[11] Ray's deposition at 13; Lee's deposition at 40.

[12] *Id.*

[13] Spier's deposition at 44.

[14] *Id.* at 52-53.

[15] *Id.* at 54.

[16] *Id.* at 56-57.

[17] This numerical ranking does not take into consideration performance evaluations, work history, disciplinary action, job duties, or any criteria other than the interview. *See* Spier's deposition at 61-62.

7

information in the table for explanatory purposes.[18])

TABLE 1

| NAME OF APPLICANT | CUMULATIVE SCORE | APPLICANT'S RACE |
|---|---|---|
| Lavernice Garrett | 47.00 | African-American |
| Verna Garner | 41.33 | African-American |
| Delshon Bonney | 37.33 | African-American |
| Bertha Drake | 37.00 | Caucasian |
| Wanda Norman | 35.66 | African-American |
| Linda Lee | 35.33 | Caucasian |
| Tina Nettles | 35.33 | African-American |
| Jean Stone | 34.66 | Caucasian |
| Alvin McDaniel | 31.66 | African-American |
| Vicky Ray | 29.66 | Caucasian |

The parties have supplied the court with the individual rankings of each panel member,[19] and that information is listed in table 2, below. (Each applicant is listed under the name of each panel member in descending order of "most qualified" to "least qualified"; further, the names of the African-American applicants are shaded.)

---

[18] This court has derived the race of each applicant from Lee's deposition at 14-23.

[19] Ethridge's deposition at exhibit 2.

8

Table 2

| CHARLES CUTTS | BETTIE PERKINS | GREG ETHRIDGE |
|---------------|----------------|---------------|
| [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| [REDACTED] | Bertha Drake | Bertha Drake |
| Linda Lee | Linda Lee | [REDACTED] |
| [REDACTED] | [REDACTED] | Jean Stone |
| Bertha Drake | [REDACTED] | Linda Lee |
| [REDACTED] | Jean Stone | [REDACTED] |
| Jean Stone | [REDACTED] | [REDACTED] |
| [REDACTED] | [REDACTED] | [REDACTED] |
| Vicky Ray | Vicky Ray | Vicky Ray |

Based on table 2, it is undisputed that plaintiff Vicky Ray was ranked at the very bottom of the list by all interview panel members. It also is undisputed that Cutts and Perkins, the two African-American panel members, ranked plaintiff Linda Lee higher than Ethridge, the Caucasian panel member.

Following the interview process, Ethridge and Perkins reviewed the personnel files of all applicants.[20] They considered performance evaluations for the three preceding years,[21] the manner in which each applicant "may have managed their staff in the

---

[20] *Id.* at 28-29.

[21] *Id.* at 46.

past,"[22] disciplinary actions,[23] and shift preferences. For instance, plaintiff Linda Lee expressed a preference for the third shift, but said she would consider an assignment to the first shift.[24]

The panel then made a recommendation to Mr. Spier, who in turn presented the recommendation to Mr. Earnest, the director of residential services, and ultimately to Mr. Garrison, the director of the Wallace Center.[25] Garrison was the ultimate decisionmaker.[26]

Three of the first four promotions were offered to African-American employees, all of whom received ranked interview scores greater than either plaintiff. Lavernice Garrett was promoted to a first shift position,[27] while Verna Garner and Delshon Bonney were promoted to second shift positions.[28] The fourth promotion was offered to Bertha Drake, a Caucasian female, who also received higher interview scores than either plaintiff, but she declined because she did not want to work second shift.[29] Thereafter, Tina Nettles, an African-American female with an interview score

---

[22] *Id.* at 24.
[23] *Id.*
[24] *Id.* at 68.
[25] Spier's deposition at 43, 95.
[26] *Id.* at 95.
[27] Ethridge's deposition at 65, 68.
[28] *Id.* at 65-69.
[29] *Id.* at 39-40.

10

identical to that of plaintiff Linda Lee (35.33), was offered a promotion on second shift.[30] Tina Nettles, however, had been suspended on three different occasions, five years prior to her interview, for insubordination, excessive absences, and stealing credit cards.[31] All three suspensions occurred within a nine month period.[32]

In August of 1997, Delshon Bonney was terminated from his position.[33] Although Bonney originally was promoted to work second shift, he was working third shift on the date of his termination.[34] Alvin McDaniel, an African-American male, was promoted into the vacant mental health worker III slot.[35] Linda Lee had a higher composite interview score than McDaniel, and, McDaniel had received lower performance evaluations than Lee during each of the three previous years.[36] Moreover, McDaniel received four suspensions for sick leave abuse in 1992, 1993, 1995, and 1996.[37] By virtue of

---

[30] *Id.* at 66, 69.

[31] *Id.* at 52-53.

[32] *Id.* at 54.

[33] *Id.* at 89.

[34] *Id.* at 88-89.

[35] *Id.* at 90-91.

[36] In 1996, McDaniel received a 17.5 on his performance evaluation, wheras Lee received a 26. *See* plaintiffs' exhibits 19, 21. In 1995, McDaniel received a 23, and Lee a 26. *Id.* In 1994, McDaniel received a 26, while Lee received a 28. *Id.* The maximum score that could have been received by any applicant during this time period was a 40. *Id.*

[37] *Id.* at exhibit 21.

11

working third shift, Linda Lee argues that her work history made her more qualified than McDaniel for the promotion, because she regularly was appointed as acting supervisor over her unit, and sometimes the entire Wallace Center, and in that capacity performed the equivalent job responsibilities to a mental health worker III.[38] Vicky Ray also had received higher performance evaluations than McDaniel,[39] but a lower interview score.[40]

Both plaintiffs retired from their positions with the Alabama Department of Mental Health and Retardation after not receiving any of the promotions.[41] They then filed this lawsuit, claiming that defendants, especially Perkins, discriminated against them on the basis of their race. Both plaintiffs claim that they were more qualified than McDaniel, and some of the other applicants.

### III. DISCUSSION

Defendants move for summary judgment on all claims asserted by

---

[38] Lee's deposition at 15-18.

[39] Ray received a score of 29 on all three of her performance evaluations. *Id.* at exhibit 20.

[40] The court also notes that there is some evidence that Ray received a written reprimand during the three years prior to the interviews. Moreover, there also is some evidence that she appealed this reprimand and it was removed from her file a year later. However, the court is uncertain as to whether the reprimand was rescinded prior to the selection process, or whether the reprimand was present in her personnel file when promotion decisions were made. In construing the evidence in the light most favorable to Ray, however, the court concludes, for the purposes of this motion, that the reprimand was not present in her file when McDaniel was promoted. *See* Ray's deposition at 75-77.

[41] Ray's deposition at 67; Lee's deposition at 64.

12

plaintiffs based on Eleventh Amendment and qualified immunity

grounds. They also contend that plaintiffs failed to prove pretext

under the now familiar analytical framework announced in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973). The court will address each of these arguments in turn.

## A. Eleventh Amendment Immunity

Plaintiffs employ the same factual allegations to assert

violations of Title VII and 42 U.S.C. § 1983. Specifically,

plaintiffs argue that defendants' conduct constituted unlawful

disparate treatment under the provisions of Title VII.[42]    They

further contend that such racial discrimination violates 42 U.S.C.

§ 1983, which provides a basis for relief of federal law violations

that are committed by persons acting under color of state law.[41]

---

[42] 42 U.S.C. § 2000e-2(a)(1)makes it unlawful for an employer

> to fail or refuse to hire or to discharge any individual, or
> otherwise to discriminate against any individual with respect to his
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin ....

[43] That statute provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress. For the purposes of this section, any Act
> of Congress applicable exclusively to the District of Columbia shall
> be considered to be a statute of the District of Columbia.

13

The Eleventh Amendment bars suit in federal court against states and their officials. *See Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). That amendment provides:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U. S. Const. amend. XI. The amendment has been interpreted to prohibit not only suits against a state by citizens of another state, but also suits against a state initiated by that state's own citizens. *Summit*, 180 F.3d at 1336 (citing *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 18-19, 10 S.Ct. 504, 508, 33 L.Ed. 842 (1890)). The amendment does not extend, however, to counties, municipal corporations, or other political subdivisions of the state. *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

Moreover, state officials sued in their official capacity are also protected by the amendment, as long as the state is, in fact, the real party in interest. *See Pennhurst State School & Hospital*

---

42 U.S.C. § 1983.

14

*v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act." *Id.* at 101 n.11, 104 S.Ct. at 908 n.11 (internal quotation and citation omitted). "For example, if a lawsuit seeks to order the state officer to pay funds directly from the state treasury for the wrongful acts of the state, then the state is the real party in interest and the Eleventh Amendment bars the suit." *Summit*, 180 F.3d at 1336. This precedent indicates that plaintiffs cannot avoid application of the sovereign immunity doctrine simply by suing arms of the state, state officials, or state employees, as opposed to the state itself.[44]

While sovereign immunity operates broadly to shield a state and its officials from liability, it is not absolute. The Eleventh Circuit recently summarized the three different situations where the Eleventh Amendment will not protect a state from suit:

---

[44] The Alabama Department of Mental Health and Mental Retardation is a department of the state government and, therefore, may be entitled to Eleventh Amendment immunity. *See Cross v. Alabama*, 49 F.3d 1490, 1502-1503 (citing Alabama Code § 22-50-2). Similarly, Virginia Rogers, in her capacity as commissioner of the department, and Bettie Perkins, in her capacity as Unit Director at the Wallace Center, also may be entitled to sovereign immunity as "state officials." *Id.*

15

> The Supreme Court has recognized three situations in
> which there is a "surrender" of Eleventh Amendment
> sovereign immunity: (1) when a state waives its Eleventh
> Amendment sovereign immunity and consents to suit in
> federal court, *see Atascadero State Hosp. v. Scanlon*, 473
> U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 71
> (1985); (2) when Congress, acting pursuant to § 5 of the
> Fourteenth Amendment, abrogates a state's Eleventh
> Amendment sovereign immunity by expressing an unequivocal
> intent to do so, *see Seminole Tribe of Florida v.*
> *Florida*, 517 U.S. 44, 55-73, 116 S.Ct. 1114, 1123-32, 134
> L.Ed.2d 252 (1996); and (3) when a state official is sued
> for prospective injunctive relief to end a continuing
> violation of federal law, *see id.* at 73, 116 S.Ct. at
> 1132; *Ex parte Young*, 209 U.S. 123, 155-56, 28 S.Ct. 441,
> 452, 52 L.Ed. 714 (1908).

*Harbert International, Inc. v. James*, 157 F.3d 1271, 1278 (11th
Cir. 1998).

Here, the second exception operates to strip defendants of
sovereign immunity with respect to plaintiffs' Title VII claims.
In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d
614 (1976), the Supreme Court held that Congress, pursuant to its
powers under section five of the Fourteenth Amendment, validly
abrogated sovereign immunity in the Title VII context. *See id.* at
456, 96 S.Ct. at 2671; *see also Allen v. Alabama State Board of*
*Education*, 816 F.2d 575, 577 (11th Cir. 1987). Accordingly,
plaintiffs' Title VII claims against defendants are not barred by
the Eleventh Amendment.[45]

---

[45] Because plaintiffs have not pled a cause of action under 42 U.S.C. §

16

## B.  Plaintiffs' Claims Under 42 U.S.C. § 1983

Plaintiffs also seek redress under section 1983 for the same
allegations of discrimination that give rise to their Title VII
claims.  Plaintiffs, however, misunderstand the interplay between
Title VII and section 1983.

It must be noted that liability under section 1983 is premised
on proof of the "deprivation of any rights, privileges, or
immunities secured by the Constitution and laws [of the United
States]."  42 U.S.C. § 1983.  A cause of action under section 1983,
therefore, cannot arise unilaterally.  Rather, liability under that
statute only follows the establishment of an independent violation
of federal constitutional or statutory law.

This simple proposition is complicated, however, by the fact
that "not all federal statutory ... violations under color of state
law give rise to a § 1983 claim for relief."  1A Martin A. Schwartz
& John E. Kirklin, *Section 1983 Litigation: Claims and Defenses* §
4.1, at 431 (3d ed. 1997).  While section 1981 violations may be
pursued through Section 1983, the same cannot be said for Title VII
claims,

> One of the recurring issues in the lower courts concerns
> the ability to enforce Title VII of the Civil Rights Act

---

1981, the court need not discuss whether the third exception has any application
to the present dispute.

17

of 1964 and related constitutional rights under § 1983.
The issue arose prior to the 1991 Civil Rights Act
amendments to Title VII as well as after the amendments.
With regard to preamendment claims, the lower federal
courts held that the enforcement scheme set forth in
Title VII is the exclusive means for enforcing the
statutory rights guaranteed by that Act, thereby
precluding resort to § 1983.  These cases reason that a
contrary ruling would allow a claimant to bypass the
detailed procedural scheme set forth in Title VII, and in
some instances, secure relief that is available under §
1983 but not Title VII.    This would frustrate the
congressional intent behind Title VII.    This analysis
holds true for post-1991 amendment claims as well.

A related issue that has arisen with great frequency
is whether constitutional claims related to a Title VII
claim can be asserted under § 1983.  For preamendment
claims, the lower federal courts consistently ruled that
constitutional claims can be asserted under § 1983 even
if the same facts upon which they are based also give
rise to claims under Title VII.  This result too should
hold true for postamendment claims.

*Id.* § 4.2, at 452-53.  Because plaintiffs do not couple their Title

VII claim with a constitutional claim, they cannot utilize Section

1983 to enforce their Title VII rights.  *See Arrington v. Cobb*

*County,* 139 F.3d 865, 872 (11th Cir. 1998) ("Of course, an

allegation of a Title VII violation cannot provide the sole basis

of a § 1983 claim. ... Instead, Arrington satisfies the first

element of § 1983 by alleging that Hightower violated her

Fourteenth Amendment right of equal protection."). Accordingly,

plaintiffs' Section 1983 claims are due to be dismissed.

18

The only claims that remain pending in this lawsuit, therefore, are those levied by plaintiffs under Title VII. The court turns its attention to whether plaintiffs have stated race-based disparate treatment claims under that statute.

## C. Plaintiffs' Title VII Claims

Plaintiffs claim they were denied promotions on the basis of their race. They have sued the Department of Mental Health and Mental Retardation, Virginia Rogers, as commissioner of that department, and Bettie Pitts Perkins, the supervisor that allegedly operated with racially-discriminatory animus. Defendants Rogers and Perkins are due to be dismissed from this claim, however, because they are not "employers" within the meaning of Title VII.

Title VII prevents "employers" from discriminating on the basis of race, color, religion, sex or national origin. See 42 U.S.C. § 2000e-2(a)(1) (1988). An employer is defined as "a person engaged in an industry affecting commerce ... and any agent of such person." Id. at 2000e(b). Though such a definition might be interpreted to impose liability on individual employees as "agents," the Eleventh Circuit has held that "[i]ndividual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act. We think

19

the proper method for a plaintiff to recover under Title VII is by suing the employer...." *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991) (citations omitted); *see also Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995) (restating *Busby* holding). Accordingly, plaintiffs' Title VII claims against defendants Rogers and Perkins are due to be dismissed.

To prevail on a Title VII disparate treatment claim against the Alabama Department of Mental Health and Mental Retardation, plaintiffs must prove that their employer intended to discriminate on the basis of one of the impermissible factors identified by Congress: *i.e.*, "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Three forms of proof may be used: (1) statistical proof of a pattern of discrimination;[46] (2) direct evidence of a discriminatory animus;[47] or (3) circumstantial evidence. The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon which form of proof is used.

Direct evidence is evidence which, if believed, proves the existence of a fact in issue without the need of an inference or a

---

[46] *See,' e.g.*, Wilson v. AAA Plumbing Pottery Corp., 34 F.3d 1024, 1027 (11th Cir. 1994).

[47] *See, e.g.*, Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989).

20

presumption.   *See, e.g., Carter v. Three Springs Residential
Treatment,* 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by
definition, is evidence that does not require ... an inferential
leap between fact and conclusion."); *Merritt v. Dillard Paper Co.,*
120 F.2d 1181, 1189 (11th Cir. 1997) (defining direct evidence as
"evidence, which if believed, proves existence of fact in issue
without inference or presumption"); *Rollins v. TechSouth, Inc.,* 833
F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Black's Law Dictionary*
577 (7th ed. 1999) (defining direct evidence as "[e]vidence that is
based on personal knowledge or observation and that, if true,
proves a fact without inference or presumption.").   The Eleventh
Circuit provided some examples to mark the cleavage between direct
and circumstantial evidence in *Rollins*:

> One example of direct evidence would be a scrap of paper
> saying, "Fire Rollins — she is too old." *See Williams [v.
> General Motors Corp.],* 656 F.2d [120,] at 130 [(5th Cir.
> Unit B 1981)].   This court found that there was direct
> evidence of discrimination when an INS reviewing committee
> set aside a female applicant's file without reviewing it
> because the two men knew the director would not consider
> hiring a woman investigator. *Lewis v. Smith,* 731 F.2d 1535
> (11th Cir. 1984).   In these instances, the fact that the
> evidence exists, by itself, proves the discrimination.   The
> evidence at issue here, on the other hand, suggests
> discrimination. The trier of fact must infer discrimination
> based on the evidence.   By definition, then, it is
> circumstantial evidence.

*Rollins,* 833 F.2d at 1528 n.6.

21

Direct evidence has the greatest probative value.    When a plaintiff establishes by direct evidence that a contested employment decision was motivated by a discriminatory animus, the employer "may avoid a finding of liability only by <u>proving</u> by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender [race, religion, color, national origin, age, or disability] into account."    *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (emphasis supplied); *see also, e.g., Carter*, 132 F.3d at 641; *Haynes v. W.C. Caye and Co., Inc.*, 52 F.3d 928, 931 n.8 (11th Cir. 1995).    In other words, "defendant <u>must prove</u> that there was a separate, racially neutral [*i.e.*, non-discriminatory] reason for its [contested employment decision]."    *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir. 1990) (emphasis supplied).

> In a direct evidence case, the plaintiff must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony.  If the plaintiff produces such evidence and the trier of fact believes it, the <u>defendant must prove</u> by a preponderance of the evidence that the defendant would have reached the same decision without the factor proved.    In other words, <u>the employer must prove</u> that even if it had not taken race into account, it would have come to the same decision.

*Id.*, 901 F.2d at 923 (emphasis supplied) (citations omitted).

22

Thus, the characterization of evidence as direct "dramatically affects the allocation of the evidentiary burdens." *Carter*, 132 F.3d at 641. "When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996) (citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Haynes*, 52 F.3d at 931). "By producing direct evidence, the plaintiff effectively shifts the burden of proof to the defendant, who must then show that there was no discrimination. It is rare that direct evidence of discrimination exists, however." *Rollins*, 833 F.2d at 1528.

Statements of decisionmakers directly related to the contested employment action constitute direct evidence of discrimination. *See, e.g., Carter*, 132 F.3d at 641 ("[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.") (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) (internal quotation

23

marks omitted)); *Trotter*, 91 F.3d at 1453 ("Statements indicating ... bias on the part of a decisionmaker in an employment setting can constitute direct evidence of ... discrimination in Title VII cases.") (citations omitted); *Bell*, 715 F.2d 1552 (plaintiff's supervisor voiced bias to plaintiff at the very moment he rejected plaintiff for promotion); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563-64 (11th Cir. 1985) (statement by decisionmaker that he saw no need for a woman to have a second job constituted direct evidence of discriminatory intent).

On the other hand, statements that do "not relate directly to the decision" in dispute, or "statements that are open to more than one interpretation do not constitute direct evidence of ... discrimination." *Carter*, 132 F.3d at 642; *see also Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996)(statements that could "have more than one possible meaning" are not direct evidence of discrimination). "Only the most blatant remarks, whose intent could only be to discriminate on the basis of [an impermissible factor] constitute direct evidence." *Coats v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992). Evidence merely suggesting discrimination is not sufficient. *See Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82

24

(11th Cir. 1990).

Moreover, "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804-05 (O'Connor, J., concurring).

For example, in *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990), the employer's general manager (Robert Raymond) allegedly said "if [Alton Packaging] was his company, he wouldn't hire any black people." *Id.*, 901 F.2d at 922. In addition, the production manager (Robert Diesen) allegedly yelled at one black employee "--- ---- it, you people can't do a ------- thing right." *Id.* The Eleventh Circuit held the former statement to be direct evidence of discriminatory intent by a decisionmaker, but the latter nothing more than a "stray remark," "unrelated to the decisional process itself."

> *Price Waterhouse* does not define direct evidence. In her concurrence, however, Justice O'Connor stated that "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 109 S.Ct. at 1804. <u>Raymond's statement</u> that if

25

it were his company he would not hire blacks does not fall into any of these categories. <u>Raymond</u> was a decisionmaker, and he made the remark in reference to hiring. [On the other hand,] <u>Diesen's statement</u> is the kind of stray remark contemplated by Justice O'Connor, but does not affect the outcome. <u>Raymond's statement</u> constituted direct evidence of discrimination which Alton was required to rebut by a preponderance of the evidence. The district court erred when it failed to place this burden on Alton.

*Id.* (<u>emphasis</u> supplied).

Here, plaintiffs argue that they have produced direct evidence of discriminatory animus. Specifically, plaintiffs rely on a recorded telephone conversation between plaintiffs' attorney and Vanessa Talley, a former employee of Bettie Perkins. In that conversation, Talley stated that she heard Perkins make racially derogatory comments about whites on several occasions.[48] Perkins also told Talley that she, not Ethridge or Cutts, decided who would fill the vacant mental health worker III positions.[49] Finally, Perkins told Talley that she was going to have only blacks on her unit.[50]

---

[48] Talley's deposition at 29, 51.

[49] *Id.* at 32-33, 36.

[50] That portion of Talley's statement is listed below:

Q. Did you ever hear Ms. Perkins make a comment to the effect that she was going to have all blacks on her unit?

A. Yes.

*Id.* at 37. Talley also reiterated this statement later in the same conversation:

The only thing that — as far as the — when the word "race"

26

It is the last statement that most closely resembles direct
evidence. Although Perkins was not the ultimate decisionmaker with
regard to these promotions, she did play a significant role in the
hiring process, in terms of conducting interviews and making
recommendations as to which applicants should be promoted. She
served as one of three panel members that conducted interviews, and
had either of plaintiffs been promoted, Perkins would have been
their direct supervisor. Regardless of whether Ethridge or Cutts
yielded to Perkins' wishes, as Talley's second statement suggests,
Perkins played a sufficient role in the promotions to render the
Alabama Department of Mental Health and Mental Retardation liable
for her unlawful conduct. *See generally Schoenfeld v. Babbitt*,
168 F.3d 1257, 1268 (11th Cir. 1999); *Olmsted v. Taco Bell
Corporation*, 141 F.3d 1457, 1461 (11th Cir. 1998); *Sparks v. Pilot
Freight Carriers, Inc.*, 830 F.2d 1554, 1565 (11th Cir. 1987).

---

did come in, ... The comment was made in my office that it looked
like all we was going to have was those supervisors.

And when — and [Perkins] passed by in that moment. And then
she called me in her office and she told me, she said, well,... if
I have anything to do with it, she said, that's the way it's going
to be. We have been, you know, put down out here long enough and
that —

Q.  Was she talking about the blacks?

A.  Right.

Id. at 39-40.

27

Additionally, it is clear that her statement was directly related to the employment action contested by plaintiffs. When Perkins stated to Talley that she was going to have all blacks on her unit, she specifically was referring to the promotions that plaintiffs had applied for. Moreover, Perkins' statement is not open to more than one interpretation, and does not require any explanation before it can be comprehended by a reasonable juror. Accordingly, the court concludes that this statement constitutes direct evidence of racial discrimination.[51]

---

[51] Even if this court has erred in its conclusion that Perkins' statement constitutes direct evidence of discrimination, the court alternatively concludes that plaintiffs have met their burdens of proof under the *McDonnell Douglas* framework. To establish a *prima facie* case of reverse discrimination, plaintiffs must prove (1) that they belong to a protected class; (2) that they applied for and were qualified for a job; (3) that they were rejected for the job; and (4) that the job was filled by a minority group member. *See Wilson v. Bailey*, 934 F.2d 301, 303 (11th Cir. 1991). Plaintiffs have established all of these elements because they have adduced evidence that they are both Caucasian, they were qualified for the promotions because their names were included on the "banded list" issued by the Alabama Personnel Board, they did not receive any of the five promotions, and all five positions were filled by African-American employees.

Likewise, the Department of Mental Health and Mental Retardation has articulated a legitimate, non-discriminatory reason for its decision not to promote plaintiffs. Specifically, defendant argues that the individuals who were selected for the positions were more qualified than plaintiffs.

Finally, the court concludes that plaintiffs have adduced sufficient evidence of pretext to survive summary judgment. Specifically, the court finds that plaintiffs have cast considerable doubt on defendant's conclusion that Alvin McDaniel was more qualified than either plaintiff. Both Spier and Ethridge admitted that interview scores, performance ratings, and disciplinary actions were a consideration in the hiring decision. Lee received a higher interview score than McDaniel, higher performance ratings, and no disciplinary actions, but still was not promoted. Similarly, Ray received a higher performance ratings than McDaniel, and had fewer, if no disciplinary actions. Under the circumstances, the court finds that a genuine issue of fact exists as to whether

28

As final matter, the court forewarns plaintiffs that their
reliance on this recording may raise significant evidentiary
concerns at trial. The court need not address the admissibility of
the conversation here, however, because defendants have neither
moved to strike the conversation nor filed a formal objection to
its admissibility for summary judgment purposes. *See Offshore
Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir.
1987) (following the rule announced in *Munoz v. International
Alliance of Theatrical Stage Employees*, 563 F.2d 205, 214 (5th Cir.
1977), that "if evidence otherwise inadmissible provoked no timely
objection, it could and, if material, should be factored into a

‹

---

McDaniel was more qualified than plaintiffs and, accordingly, summary judgment
is due to be denied.

29

summary judgment decision").[52]

---

[52] To the extent that plaintiffs rely on Rule 801(d)(1)(A) of the Federal Rules of Evidence, the "inconsistent statement" exception to the hearsay rule, that reliance is misplaced.

> To qualify as a prior inconsistent statement under Rule 801, the prior statement must have been given under oath, subject to the penalty of perjury, at a trial, hearing or other proceeding, or in a deposition from the same or a different proceeding. ... The requirement of a prior formal setting helps ensure the accuracy of both the statement itself and the record of the statement.

Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence § 801.21 (1999). Because Talley's recorded conversation was made over the telephone, and not under oath or at a trial, hearing, or other proceeding, it is not admissible as a prior inconsistent statement.

Moreover, although the conversation may be utilized for impeachment purposes, as it was at Talley's deposition, statements admitted for impeachment purposes are not admissible as substantive evidence. *See Wilson v. City of Aliceville*, 779 F.2d 631, 636 (11th Cir. 1986).

If admissible at all, the conversation would be admitted under Rule 807 of the Federal Rules of Evidence. That rule establishes a residual exception to the hearsay rule:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed. R. Evid. 807. First, it appears that the tape recording is sufficiently trustworthy because Talley corroborated the accuracy of the tape recording at her deposition. Specifically, Talley stated, in pertinent part:

Q. Is what you heard on the tape, is that what you recollect how our conversation went?

30

## IV.   CONCLUSION

Based on the foregoing, defendants' motion for summary judgment

is due to be granted in part and denied in part.    An order

consistent   with   this   memorandum   opinion   will   be   entered

contemporaneously herewith.

DONE this _21ˢᵗ_ day of March, 2000.

United States District Judge

---

A.   That's what I told you, yes.

Q.   So everything you hear on the tape ... that's what you related
     to me in the conversation?

A.   That's what I told you.

Q.   Okay.  And is there anything that you heard on the tape that
     you told me that is incorrect?

A.   That I heard on the tape?

Q.   Yeah, the conversation —

A.   That's — what I heard on the tape was what I told you.

Talley's deposition at 67-68.  She also admitted, prior to hearing the tape
recording, that she received thirty-seven harassing phone calls the night before
her deposition, and the threatening phone calls prompted her to leave her home.
Based on the numerous phone calls, it is possible that her deposition testimony
was made while she was under duress.  In contrast, when Talley engaged in her
phone conversation with plaintiffs' counsel, she was still employed with
defendant, and she made the statements while she was at work.  At the time that
she engaged in the telephone conversation, she knew that her comments were being
elicited in preparation for a civil lawsuit, because she was called by
plaintiffs' counsel.

     Moreover, the statement is offered as evidence of a material fact,
discriminatory intent; and plaintiffs were unable to question Talley regarding
the veracity of her prior statements, because defense counsel advised Talley to
obtain personal legal counsel due to the possibility of perjury charges.

31

**The Panel of Neutrals will be faxed independently this date.**